CP-1999-13                                                          1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re:<br><br>    Edwin H. Sepúlveda Valentín<br>    Irma E. Casiano Santiago | Querella<br><br>2001 TSPR 137<br><br>155 DPR \_\_\_\_ |

Número del Caso: CP-1999-13

Fecha: 27/septiembre/2001

Oficina del Procurador General:

                Lcda. Cynthia Iglesias Quiñones
                Procuradora General Auxiliar

Abogado de la Parte Querellada:
                Lcdo. José M. Sagardía Pérez

Materia: Conducta Profesional
       (La suspensión es efectiva a partir del 16 de octubre de 2001, fecha en que se le notificó al abogado el Per Curiam y Sentencia)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In Re:

Edwin H. Sepúlveda Valentín          CP-1999-13
Irma E. Casiano Santiago

PER CURIAM

**San Juan, Puerto Rico, a 27 de septiembre de 2001**

Una vez más, nos corresponde evaluar las consecuencias que, en la esfera de la profesión legal, tienen los actos privados de quienes han decidido ejercer la honrosa profesión de la abogacía. Nuevamente, reiteramos el principio de que "[p]or razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en la vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable."[1]

I

**El 8 de noviembre de 1986, falleció intestado el señor Domingo Rodríguez Hernández quien, a la**

---

[1] *In Re Irizarry Vega*, res. el 24 de agosto de 2000, 2000 T.S.P.R. 128.

fecha de su deceso, estaba casado con la aquí querellante, Natividad Ramírez Flores. A su muerte, además de su esposa, le sobrevivieron sus dos hijas: Hilda Rodríguez Vega y Josefina Rodríguez Oliveras.

Como único haber ganancial, el Sr. Rodríguez dejó una propiedad de dos plantas, destinada tanto para fines residenciales como comerciales, con respecto de la cual se formó una comunidad hereditaria compuesta por la Sra. Ramírez Flores y por Josefina e Hilda Rodríguez.

Tras el fallecimiento de su esposo, la Sra. Ramírez Flores[2] arrendó --en virtud de un acuerdo verbal-- la segunda planta del referido inmueble a los aquí querellados, el Lic. Edwin Sepúlveda Valentín y su esposa, la Lic. Irma Casiano Santiago[3], quienes la ocuparon durante un año para fines de vivienda. Posteriormente, el Lic. Sepúlveda suscribió un contrato de opción de compra con la Sra. Ramírez Flores, de cuyos términos surge que, por periodo indefinido, ésta le concedió una opción de compra del inmueble al Lic. Sepúlveda, y le autorizó para que gestionara préstamos y tomara decisiones que tuvieran que ver con la referida propiedad. Luego de desocupar la segunda planta arrendada, los mencionados abogados subarrendaron todo el edificio al Programa *Head Start*.[4]

---

[2] Para la fecha de los hechos, la Sra. Ramírez, <u>quien no sabe leer ni escribir, contaba con más de setenta (70) años de edad</u>.

[3] Los referidos abogados fueron admitidos al ejercicio de la profesión el 7 de noviembre de 1979 y el 6 de julio de 1994, respectivamente.

[4] Del expediente surge que dicho contrato de arrendamiento fue otorgado entre dichos abogados, <u>en calidad de arrendadores</u> y el Presbiterio del Suroeste, Inc. (Proyecto Head Start), como

Al cabo del tiempo, los referidos abogados le manifestaron a la Sra. Ramírez Flores su interés de adquirir la propiedad. A estos efectos, acordaron verbalmente, que el precio de venta del inmueble sería cien mil dólares ($100,000.00) y que se efectuaría el cierre dentro del término de noventa (90) días.

Para formalizar el acuerdo, los esposos Sepúlveda-Casiano suscribieron con la Sra. Ramírez Flores otro contrato de opción de compra.[5] Según surge de la copia del contrato que obra en el expediente, contrario a los acuerdos verbales que precedieron la formalización del mismo, en este contrato no se estableció el precio de venta del inmueble ni se pactó el término dentro del cual los optantes tendrían que ejercer la opción. Más bien, se especificó que la opción sería por término indefinido y que los optantes podrían subarrendar la propiedad sin limitación de clase alguna. Se aclaró que el contrato se efectuaba sin depósito alguno. Se reconoció, además, que los mencionados abogados habían tenido la propiedad arrendada --mediante acuerdo verbal-- a razón de $530.00 mensuales.

En el entretanto, la Sra. Ramírez Flores suscribió un contrato de arrendamiento con opción de compra de otra propiedad; por concepto de la opción, pagó la suma de cinco mil dólares ($5,000.00). Pactó con el vendedor que el periodo para ejercer dicha opción sería de noventa (90) días, el mismo periodo dentro del cual se suponía que los esposos

---

arrendatarios. En efecto, los abogados alquilaron el inmueble en cuestión en su totalidad; pactaron que la base del contrato sería anual con una opción de diez años.

[5] Este contrato fue firmado el 24 de noviembre de 1992.

Sepúlveda-Casiano ejercitaran su opción en cuanto a su propiedad.

No obstante, los hechos tomaron un curso distinto. A pesar del pacto habido entre los esposos abogados y la Sra. Ramírez Flores, los primeros <u>no</u> se ciñeron a los términos convenidos: <u>no adquirieron la propiedad ni pagaron con regularidad los cánones de arrendamiento a la Sra. Ramírez Flores, no obstante continuar percibiendo los frutos generados por concepto del subarrendamiento del inmueble.</u>

Así las cosas, como consecuencia del incumplimiento de los querellados, el contrato de arrendamiento con opción de compra, suscrito entre la Sra. Ramírez Flores y el dueño de la propiedad que ésta interesaba adquirir, <u>no</u> se pudo consumar por lo que ésta <u>perdió</u> la suma de $5,000.00 que había pagado por concepto de la opción. Además, tuvo que desalojar la referida propiedad. En varias ocasiones, la Sra. Ramírez Flores se personó a la residencia de los esposos abogados para inquirir las razones de su incumplimiento; sin embargo, sus visitas resultaron infructuosas. Similar gestión efectuaron Josefina e Hilda Rodríguez; tampoco rindió frutos dicha gestión.

La accidentada relación contractual antes reseñada desembocó en los tribunales; tanto la Sra. Ramírez Flores como Hilda y Josefina Rodríguez instaron demanda sobre sentencia declaratoria y daños y perjuicios, pleitos que fueron eventualmente consolidados.[6] En síntesis, las demandantes

---

[6] Ambas reclamaciones fueron presentadas, para mayo de 1994, por medio del mecanismo procesal de sentencia declaratoria (Regla 59 de Procedimiento Civil) contra los esposos abogados, en el

solicitaron que: se decretara la nulidad del contrato celebrado entre la Sra. Ramírez Flores y los esposos abogados; el resarcimiento por los daños resultantes del incumplimiento de los términos que precedieron el mismo y la indemnización resultante de la privación del uso y disfrute de la propiedad de las demandantes, ocasionada por el control que sobre el inmueble mantuvieron los querellados bajo el pretexto de supuestas gestiones conducentes a obtener financiamiento para la compra del mismo. Aun cuando los abogados demandados fueron debidamente emplazados, no contestaron la demanda, razón por la cual se les anotó la rebeldía. Tampoco comparecieron el día del juicio, fecha de la cual fueron notificados.

El 16 de mayo de 1995, el tribunal de instancia declaró con lugar las reclamaciones interpuestas por las demandantes; decretó la nulidad del contrato en cuestión; determinó la existencia de dolo; y reputó la posesión de los demandados como la de meros detentadores sin contrato. Además, condenó a los demandados a satisfacer a las demandantes la renta devengada por el alquiler de la propiedad, desde la fecha en que fue suscrito el contrato hasta la fecha del decreto judicial, y --a la Sra. Ramírez Flores-- la suma de $5,000 correspondiente a la cantidad que pagó por concepto de la opción. Finalmente, el tribunal ordenó el desahucio de la propiedad. Los demandados no solicitaron remedio alguno contra este dictamen, por lo que el mismo advino final y firme.

---

Tribunal Superior, Sala de Mayagüez, casos IAC94-0190 e IAC94-0217 respectivamente.

Por motivo de los hechos antes reseñados, y ante la falta de cumplimiento de los querellados con respecto a la sentencia emitida por el tribunal de instancia, la Sra. Ramírez Flores se querelló ante la Comisión de Ética del Colegio de Abogados. Dicha Comisión le informó a la Sra. Ramírez Flores que sólo tenía autoridad para intervenir en asuntos relacionados con conducta estrictamente profesional, por lo que la Sra. Ramírez Flores presentó su queja ante este Tribunal.

Mediante la correspondiente Resolución, le concedimos término al Procurador General para que investigara e informara al Tribunal sobre la conducta de los querellados. La Oficina del Procurador General, en cumplimiento de nuestra Resolución, radicó su Informe. Luego de haber recibido y evaluado el Informe radicado, ordenamos a dicha Oficina presentar la correspondiente querella.

El Procurador General compareció ante este Tribunal presentando la querella contra los Lcdos. Edwin H. Sepúlveda Valentín e Irma E. Casiano Santiago. En síntesis, imputó a los querellados las siguientes violaciones: haber suscrito un contrato de opción en contravención a las disposiciones legales y la normativa aplicable y haber infringido tanto el espíritu del Preámbulo como el Canon 38 del Código de Ética Profesional. Además, señaló, con respecto a la Lic. Casiano, su incumplimiento con el deber continuo de mantener informado a este Tribunal pues        --previo a su juramentación como abogada-- no enmendó la Declaración Informativa para notificar cambios que podían afectar la información anteriormente

sometida a la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía. Destacó que la referida abogada omitió informar los litigios pendientes --antes reseñados-- en los cuales ella y su esposo figuraban como demandados.[7]

Posteriormente, el Procurador General advino en conocimiento de que la Lcda. Irma Casiano Santiago había sido nombrada para ocupar un cargo de Juez Municipal, y solicitó a este Tribunal que ordenara a la Oficina de Nombramientos Judiciales de la Fortaleza a expedir copia certificada de la solicitud sometida por la Lcda. Casiano Santiago y de cualquier enmienda que ésta hubiera presentado con respecto a la misma; esto con el propósito de investigar si la querellada había informado a dicha Oficina los pleitos en los que fue parte demandada así como del procedimiento pendiente ante este Tribunal para dilucidar si procedía someter una enmienda a la querella.

El 11 de febrero de 2000, emitimos Resolución mediante la cual autorizamos a la Oficina de Nombramientos Judiciales a que entregara al Procurador General la copia certificada de la solicitud presentada por la Lcda. Irma Casiano Santiago, según cumplimentada por ésta con todos sus anejos. Así mismo, debido

---

[7] Surge de la querella que, el 23 de julio de 1991, la Lic. Casiano suscribió <u>bajo juramento</u> la Declaración Informativa del Aspirante en la cual <u>certificó que entendía que la obligación de proporcionar información correcta y completa en la referida declaración era de naturaleza continua hasta el momento de su juramentación.</u> No obstante ello, aunque la Lic. Casiano fue <u>emplazada el 15 de junio de 1994 y fue admitida al ejercicio de la abogacía el 6 de julio del mismo año, no informó este hecho a la Junta Examinadora</u>.

a que los querellados no contestaron la querella dentro de los términos concedidos, este Tribunal la entendió negada.[8]

Conforme la Resolución emitida el 28 de abril de 2000, en la cual denegamos la solicitud de archivo de la querella presentada por la Sra. Ramírez Flores[9], concedimos término al Procurador General para que enmendara la querella radicada.

A tenor con ello, el Procurador General radicó enmienda a la querella mediante la cual consignó dos nuevos cargos con respecto a la conducta profesional de la Lic. Casiano. En esta ocasión, le imputó dos violaciones al Canon 35 de Ética Profesional. La primera violación consistió en haber omitido información esencial en la solicitud de historial personal que debía suplir a la Oficina de Nombramientos Judiciales de la Oficina del Gobernador.[10] Tal solicitud fue presentada en la antedicha Oficina tras haber sido nombrada, la Lcda. Casiano, por el ex-Gobernador de Puerto Rico, Hon. Pedro Rosselló González, como Juez Municipal. Dicha solicitud fue entregada

---

[8] Posteriormente, designamos al Hon. Agustín Mangual para que, en presencia de las partes y en calidad de Comisionado Especial, escuchara y recibiera la prueba que éstos le presentaran.

[9] Habiendo transcurrido casi cinco años del dictamen emitido en los pleitos consolidados, tras la radicación de la querella que dio origen al presente proceso disciplinario, los querellados llegaron a un acuerdo con la Sra. Ramírez Flores. Por medio del mismo, se obligaron a satisfacer la cuantía dispuesta en la sentencia. El referido acuerdo contenía relevo recíproco de responsabilidad. Además,  contenía un cláusula por medio de la cual la querellada se comprometió a solicitar de la Oficina del Procurador General el archivo con perjuicio del procedimiento que ella misma había iniciado. Surge del expediente que mediante carta fechada el 1 de marzo de 2001, la Sra. Ramírez Flores solicitó a este Tribunal el archivo de la querella.

[10] Esta solicitud fue juramentada por la querellada el 17 de mayo de 1996, esto es, un año después de dictada la sentencia de las demandas que operaban en su contra.

como parte de los documentos que es necesario cumplimentar a los fines de la confirmación del nombramiento. El referido documento requiere, entre otras cosas, que el solicitante indique si en algún momento ha sido parte de algún pleito civil o ante alguna agencia administrativa en cuyo caso se tiene que proveer además el número del caso, el tribunal o agencia en donde se ventiló, la naturaleza de la controversia y el resultado del pleito. Ante tal requerimiento, la Lic. Casiano sólo hizo referencia a otra demanda, por nulidad de contrato, en la cual tanto ella como su esposo figuraban como demandados.[11] No proveyó información alguna sobre la acción civil que sirve de base a la presente querella.

La segunda violación imputada es de índole similar: se le imputó no haber provisto información completa, acerca de los casos en los cuales había sido parte, al llenar el formulario de la Comisión de Nombramientos del Senado de Puerto Rico.[12]

---

[11] El único caso al cual hizo referencia fue al CD94-715. En dicho caso, se demandó a los aquí querellados por hechos de naturaleza similar a la de los que condujeron a la Sra. Ramírez Flores al tribunal: un contrato de arrendamiento cuya legalidad se puso en entredicho. Aunque este caso no lo consideramos en este procedimiento, cabe destacarse que en esa demanda se alega que la Lic. Casiano --entre otros actos-- logró que el demandante firmara contrato de arrendamiento valiéndose del dolo, el engaño y la mala fe. Claro está, hay que mencionar que pese a la seriedad de ésa y otras alegaciones, este pleito se archivó sin perjuicio pues las partes desistieron de continuar con el mismo.

[12] Según la querella enmendada, ese formulario fue juramentado el 3 de febrero de 2000 y presentado en aras de que su nombramiento fuera evaluado por el Senado de Puerto Rico. En éste, sólo suplió los datos correspondientes a las demandas incoadas por la aquí querellante y las hijas de su finado esposo.

El 30 de junio de 2000, los querellados comparecieron mediante contestación a la querella enmendada; **negaron los cargos y solicitaron su "exoneración total"**.

Examinadas las constancias del expediente y el Informe del Comisionado Especial, procedemos a resolver. Disponemos --en primer lugar-- de aquellas imputaciones éticas que involucran tanto al Lic. Edwin Sepúlveda como a la Lic. Irma Casiano; las mismas están vertidas en los primeros tres (3) cargos y están basadas en conducta impropia no relacionada con la práctica de la profesión.

II

**El Preámbulo del Código de Ética Profesional consigna el ideal del buen abogado. De su texto, se palpa con indudable tenor el deber de todo abogado de "instituir y mantener un orden jurídico íntegro y eficaz, que goce de la completa confianza y apoyo de la ciudadanía." Recae en la profesión jurídica la misión de preservar la fe del Pueblo en la justicia, uno de los pilares básicos para la consecución de la convivencia social dentro de una democracia. Preámbulo del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.**

En estricta correspondencia con lo anterior, el Canon 38 de Etica Profesional, ante, en lo pertinente, establece que:

> [e]l abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. [ ... ] ...Por razón de la confianza

en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable.

Mediante innumerables pronunciamientos, hemos trazado los linderos de lo que constituye conducta violatoria del precitado Canon. El texto del mismo, si bien presenta un extracto de los más básicos postulados que deben regir la manera como se debe conducir cada abogado, es --sin dudas-- un llamado a la circunspección de acción y de palabra; es una convocatoria a un desempeño que no sólo debe ceñirse a las pautas éticas mínimas sino que debe ser reflejo del más alto calibre de excelencia humana. In Re Nogueras Cartagena, res. el 28 de marzo de 2000, 2000 T.S.P.R. 55.

Esta es la esencia del mandato moral, del elevado compromiso que contrae libremente cada abogado una vez es admitido al ejercicio de la profesión. De ahí la prudencia, el decoro que --tanto en la gestión profesional como en el quehacer cotidiano-- deben caracterizar sus actos. Y es que tiene que ser así, pues su ejecutoria no sólo le afecta a sí mismo sino que alcanza una dimensión mayor.

Como mencionamos en In re Coll Pujols, 102 D.P.R. 313 (1974), todo miembro de la clase togada es un espejo en el cual se refleja la imagen de la profesión. Sus actos reflejan ante la comunidad las bases del concepto que ésta se forme, no solamente del abogado en particular que actúa, sino también de toda la clase profesional, la cual debe representar con limpieza, lealtad, y el más alto sentido de responsabilidad.

Por ello, le es imperativo al abogado exaltar el honor y la dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales. In re Sánchez Rodríguez, 123 D.P.R. 876 (1989), citando con aprobación a: In re Roldán Figueroa, 106 D.P.R. 4 (1977) e In re Ríos Lugo, 119 D.P.R. 568 (1987). En la misma vertiente, precisa añadir que todo despliegue de conducta que atente contra este principio pone en entredicho las valiosas ejecutorias y beneficios mayores a los cuales esta clase profesional ha contribuido históricamente. In re Díaz García, 104 D.P.R. 604 (1976).

Es pues necesario que cada miembro de la clase togada tenga clara conciencia de que la práctica de la abogacía, a diferencia de otras profesiones, conlleva una seria y delicada función ciudadana porque la misma representa servicio, ética y ejemplo. Ramos Acevedo v. Tribunal Superior, 133 D.P.R. 599 (1993). Huelga decir que los antedichos valores no pueden ser considerados como instrumentos de utilería, como disfraces que emplea el abogado cuando se desempeña en un escenario legal. Más bien, éstos son principios a base de los cuales se forja un estilo de vida y los mismos no deben ser menoscabados por el quehacer diario o por el ambiente social y valorativo dentro y alrededor del cual se desenvuelven los abogados. In re Sánchez Rodríguez, ante.

Tal como mencionáramos en In re Bryan Picó, res. el 3 de enero de 2000, 2000 T.S.P.R. 1, no existe dicotomía alguna entre la vida cotidiana del ciudadano que es abogado y el ejercicio de su profesión debido a que los Cánones de Ética Profesional

se aplican tanto a la vida privada como profesional de un abogado. Dicho de otra manera, las responsabilidades éticas de los miembros de la profesión de abogado no tienen un horario de trabajo. Ahora bien, no nos incumbe cualquier tipo de conducta privada del abogado, sino sólo aquélla que le hace indigno de pertenecer al foro. Véase: In re Ramírez Ferrer, res. el 1 de marzo de 1999, 99 T.S.P.R. 38.

Así, pues, por medio de un procedimiento disciplinario, más allá de castigar al abogado por la falta cometida, procuramos proteger a la comunidad y a la profesión mediante una investigación de las condiciones morales del querellado para determinar si éste puede, y debe, continuar ejerciendo la honrosa profesión a la cual fue admitido por este Tribunal. Es de notarse que el criterio que rige es uno de profilaxis social. De ahí que la causa del desaforo o suspensión no tiene necesariamente que surgir con motivo de una actividad profesional. Lo que se requiere de la conducta imputada es que afecte las condiciones morales del querellado. In re Liceaga, 82 D.P.R. 252 (1961).

Conforme con la normativa antes reseñada, procede dilucidar si la conducta de los querellados está reñida con la misma.

### III

En múltiples ocasiones, hemos señalado que este Tribunal no está obligado a aceptar el informe de un Comisionado Especial; esto es, podemos adoptar el mismo, modificarlo e, inclusive, rechazarlo. In re López de Victoria Brás, 135

D.P.R. 688 (1994); <u>Vélez Ruiz v. E.L.A</u>, 111 D.P.R. 752 (1981); <u>In re Soto López</u>, 135 D.P.R. 642 (1994). Sin embargo, si las determinaciones de hecho del informe están sostenidas por la prueba obrante en autos, ausente demostración alguna de prejuicio, parcialidad o error manifiesto de parte del Comisionado Especial, este Tribunal no habrá de alterarlas. <u>In re Arroyo Fernández</u>, 133 D.P.R. 364 (1993); <u>In re Rivera Arvelo y Ortiz Velázquez</u>, 132 D.P.R. 840 (1993) e <u>In re Coltón Fontán</u>, 128 D.P.R. 1 (1991).

Con lo anterior en mente, cabe destacar que, aunque el Informe del Comisionado Especial en el presente caso se nutre esencialmente de la sentencia en rebeldía que emitió el foro de instancia al dilucidar las reclamaciones que dieron lugar a la querella de epígrafe, adoptamos el mismo para la disposición de este caso. Al así hacerlo aclaramos que, si bien acogemos las determinaciones de dicho foro judicial, no es porque supeditemos nuestra decisión al fallo emitido. Siendo éste un proceso distinto e independiente de aquél en virtud del cual se les impuso a los querellados responsabilidad por su conducta dolosa, dicho dictamen <u>no</u> implica --en este contexto-- un curso decisorio automático. <u>Debe quedar claro que todo proceso disciplinario se ejecuta en armonía con el debido proceso de ley, con arreglo a un procedimiento formal mediante el cual no sólo se le informa al abogado de los cargos que operan en su contra, sino que --más importante aún-- se le ofrece amplia oportunidad para contestarlos y defenderse.</u> Véase: <u>In re Pagán</u>, 71 D.P.R. 761 (1950).

Así, reiteramos que nuestro proceder en el presente caso obedece, más bien, a que el antedicho dictamen judicial encuentra apoyo en las constancias del expediente; además, en su oportunidad para defenderse y derrotar cualquier viso de conducta reñida con los cánones de ética profesional, los aquí querellados han propuesto una teoría claramente insatisfactoria. Veamos.

Por un lado, los querellados, en su escrito de reacción al Informe del Procurador General, alegan, con respecto al consabido contrato de opción, que entendían "que lo que existió siempre fué [sic] un contrato de arrendamiento sin término, mes a mes [sic] que el contrato de opción fue un documento que se hizo con un propósito diferente a obligar a la querellante a concedernos la opción."[13] Sin embargo, admiten los querellados en su escrito que el alegado propósito era acreditarles a los arrendatarios su facultad para arrendar el inmueble y ——además—— presentarlo a la institución prestataria que habría de financiar el inmueble para lo cual no sólo tendrían que desalojar la propiedad, sino que no podrían pagar canon alguno hasta que no la arrendaran en su totalidad. Afirman que la querellante, una dama analfabeta de más de 70 años de edad sin ningún tipo de escolaridad, conocía y aceptaba esta estrategia de negocios. Hiere la vista tan patente inconsistencia.

---

[13] Contrario a ello, figura en el expediente un documento intitulado "Cesión de contrato privado de arrendamiento" mediante el cual se reconoce la existencia de un contrato de opción de compra sobre el inmueble en cuestión mas se libera a la Sra. Ramírez de sus responsabilidades como cedente de la misma.

Es inmaterial, para la adjudicación de este caso, el que los querellados no hayan ejercitado la opción de compra del inmueble. Esto así toda vez que, en nuestro ordenamiento, la única obligación del optante en un contrato de opción es decidir --dentro de un plazo cierto-- sobre la celebración o no del contrato principal; de negarse a celebrar, puede que pierda lo que pagó por concepto de la opción --si lo hubo-- que es un elemento accidental de este tipo de contrato. Más allá de ello, el optante no tiene obligación adicional. Valentín v. Vázquez, 103 D.P.R. 796 (1975).

Ahora bien, lo que no puede pasar desapercibido es el mero hecho de que los querellados hayan refrendado un contrato de opción como el de autos, plagado de irregularidades,[14] dando así una apariencia de legalidad y confiabilidad con respecto a una transacción viciada y creando en la querellante una expectativa irreal[15] de que adquirirían la propiedad, cuando éstos siempre pensaron que lo que había existido era un contrato de arrendamiento. Ésta es conducta impropia que no podemos refrendar. In re López de Victoria, ante.

---

[14] Resulta curioso que los querellados afirmen que el contrato de opción suscrito fue un contrato que se "realizó conforme a la ley y al derecho vigente en P.R.". Por decir lo menos, tal afirmación refleja un claro desconocimiento del derecho aplicable para la configuración de este tipo de obligación.

[15] Surge del expediente que los querellados confrontaron problemas desde un inicio en las gestiones para obtener el financiamiento para la compra del inmueble. Esto así, no sólo porque no podían amortizar las aportaciones que se exigen para gestionar un préstamo comercial sino porque, además, con la previa adquisición de una residencia, su margen prestatario se redujo.

Sumado a lo anterior, cabe subrayar los efectos perjudiciales que sobre la Sra. Ramírez Flores tuvo el proceder de los querellados. Más allá de contravenir tanto los acuerdos verbales habidos entre las partes como los preceptos legales aplicables al contrato en cuestión,[16] los querellados se sirvieron del artificio de dicho contrato para perpetuar el arrendamiento del inmueble y su irrestricta facultad para subarrendarlo. Así, aun cuando éstos percibieron las rentas devengadas por concepto del subarrendamiento, faltaron a su deber de satisfacer los pagos a los que ellos se habían obligado.[17]

Peor aún, a más de un año de haberse dictado sentencia mediante la cual se les impuso responsabilidad, siendo ésta final y firme, los querellados señalaron, como si se tratara de un acto digno de ser elogiado, que "lo precedente [sic] es que la parte querellante se comunique con su abogado para que haga efectiva la Sentencia [...] Estamos en disposición de reunirnos con el abogado de doña Natividad y llegar a un acuerdo sobre la Sentencia dictada." Tan prestos fueron para solucionar

---

[16] Véase Valentín v. Vázquez, ante.

[17] Este hecho no sólo se encontró probado a nivel del foro sentenciador, sino que, en el precitado escrito de reacción al informe del Procurador General, los querellados admiten que adeudaban los cánones correspondientes a seis meses, lo que se traducía a la cantidad de $3,180.00. Aunque en Colegio de Abogados v. Barney, ante, decretamos el archivo de la querella al entender que la deuda surgida del arrendamiento del local donde ubicaba la oficina profesional del querellado, aunque era conducta ciertamente reprochable, sin más, no ameritaba el ejercicio de nuestra jurisdicción disciplinaria, los hechos de este caso claramente son distintos. Aquí, la conducta de los querellados no se limitó a incumplir unos acuerdos pactados.

el asunto, que no fue hasta el 29 de febrero de 2000, es decir, mucho más de cuatro años de haber advenido final y firme la sentencia dictada, que, luego de iniciado el procedimiento de epígrafe, los querellados llegaron a un acuerdo con los demandantes para satisfacer la sentencia dictada, con la obvia intención y propósito de que la Sra. Ramírez Flores "desistiera" de la querella.

Valga destacar que el problema no estriba en que haya recaído sobre los querellados una sentencia en rebeldía. Desde una perspectiva ética, el problema reside en la falta de sujeción con respecto a un mandato final. Como abogados y ministros de la justicia que son los querellados, habiendo renunciado al empleo de los mecanismos post-sentencia reconocidos en nuestro ordenamiento procesal, debieron haber respondido con diligencia y prontitud al mandato del tribunal.

Sin dudas, este comportamiento opera en detrimento de la imagen de la profesión y constituye una violación al precepto que le exige a todo abogado conducirse, aún en su vida privada, de forma digna y honorable. Incluso el mismo denota un claro menosprecio por la seriedad que debe de acompañar todo acto legal en el que cada abogado se ve envuelto. In re Ramírez Ferrer, ante.

IV

Finalmente, resta evaluar si la conducta de la Lic. Irma Casiano Santiago --al omitir información tanto en la

Los hechos reseñados ilustran que la conducta de éstos, más que

Declaración Informativa sometida a la Junta Examinadora, como en la Solicitud de Historial Personal presentada en la Oficina de Nombramientos Judiciales de la Oficina del Gobernador así como en el formulario provisto por la Comisión de Nombramientos del Senado de Puerto Rico--constituye conducta reñida con los Cánones de Ética Profesional. Abordaremos primero el asunto de la omisión de información en la Declaración Informativa.

Como parte del poder inherente de este Tribunal para reglamentar la admisión de una persona al ejercicio de la abogacía, está la facultad de investigar y tomar las determinaciones correspondientes sobre el carácter y la aptitud de todo aspirante al ejercicio de la profesión. Tal función ha sido delegada a la Comisión de Reputación de Aspirantes al Ejercicio de la Abogacía. Para hacer dichas determinaciones --las cuales gozan de gran deferencia-- este organismo se sirve de la prueba que tiene ante sí sobre la conducta pasada y presente del aspirante.        4 L.P.R.A Ap. XVII-A, R-2, In re Belén Trujillo, 128 D.P.R. 949 (1991).

En el proceso de acopio de información, la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía juega un papel esencial. Entre sus funciones, está la de recibir toda aquella información que complementa la solicitud de reválida, la cual --eventualmente-- habrá de ser referida a la dicha Comisión para el proceso de evaluación de los aspirantes de manera que ésta última pueda cumplir con su encomienda.

---

reprochable, está reñida con los Cánones de Ética Profesional.

Entre los formularios que tiene que completar cada aspirante, se encuentra la Declaración Informativa. Al respecto, nos comenta el Profesor Luis Mariano Negrón Portillo, en su obra Ética Profesional, Hato Rey, Impresos Araya, 1993, que ésta "sirve entre otras cosas, para obtener datos que puedan arrojar luz sobre las cualidades morales del aspirante." En dicha declaración, al aspirante se le requiere que conteste, entre otras cosas, si ha figurado o figura como demandado o reconvenido en algún procedimiento o acción civil. Al final de la declaración, tiene que prestar juramento ante notario de que la información brindada en la misma es cierta. Asimismo, éste certifica que entiende que su obligación de proporcionar información correcta y completa es de naturaleza continua hasta el momento de la juramentación. A estos efectos, añade el Profesor Negrón Portillo en la precitada obra que:

> [e]l ofrecer la información correcta y exacta en esta Declaración Informativa es de suma importancia, no solo por que el solicitante se expone a ser procesado por perjurio, sino porque la ley (4 L.P.R.A. Sec. 734) dispone que "*cualquier acto o manifestación fraudulentos hechos por el solicitante en conexión con su solicitud [...], será causa suficiente para la revocación de su licencia por la Corte Suprema de Puerto Rico.*" Precisamente, fue esto lo que sucedió en *In re López*,[18] 15 D.P.R. 265 (1909). (Énfasis en el original.)

---

[18] En dicho caso, habiendo sido Julián López admitido al ejercicio de la abogacía, se encontró que éste había alegado falsamente --en declaración jurada para que se le admitiera a esta profesión-- la fecha de su ingreso a la universidad, por lo que se resolvió dejar sin efecto la resolución mediante la cual se le admitió al ejercicio de la profesión y se ordenó la consecuente eliminación de su nombre del Libro Registro de Abogados.

Basta una ligera lectura de lo antes expuesto para comprender que la corrección y la seriedad que exige, desde su fase embrionaria hasta su final, el procedimiento de admisión a la profesión no constituyen requisitos vanos ni mucho menos estériles. El tenor de cada requerimiento de este proceso es <u>necesario</u> para la consecución de una selección depurada con el propósito de lograr, en la medida de lo posible, que los admitidos al ejercicio de esta loable profesión tengan el carácter y la estatura moral que deben distinguir a cada miembro de ella.

**Como consecuencia, la falta de la Lic. Casiano al no presentar, previo a la fecha de juramentación, la correspondiente enmienda a la Declaración para notificar que figuraba como demandada en dos pleitos —como era su deber— constituye una violación de las normas adoptadas por la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía.**

Aunque nos parece harto evidente, por el bien de la comunidad jurídica enfatizamos que cualquier tipo de violación a los requerimientos del proceso de admisión entorpece las labores de la Comisión de Reputación en su delicada función de investigar y tomar determinaciones bien fundamentadas sobre el carácter y la aptitud de todo aspirante a la profesión de la abogacía.

**En vista de lo anterior, nos sorprende el hecho de que, ante el cargo que a estos efectos le fuera formulado, la querellada respondiera "[n]o sabemos aún si existe alguna obligación de un aspirante al ejercicio de la abogacía,**

notificar que ha sido demandada después de haber radicado la correspondiente solicitud. Tampoco sabemos de si [sic] existir tal obligación le es notificado de alguna manera. [...] Lo cierto es que la querellada no era abogada admitida cuando se firmó el contrato, ni cuando fue [sic] demandada." No podemos más que decir que estas expresiones nos dejan perplejos; denotan desdén con respecto a las disposiciones que gobiernan este delicado proceso e, incluso, nos llevan a pensar que su conducta es contumaz o, quizás, ésta realmente no comprende la gravedad de la falta.

Resta evaluar el proceder de la querellada al no suplir la información exacta y completa en sendos documentos sometidos a la Oficina de Nombramientos Judiciales de la Oficina del Gobernador así como a la Comisión de Nombramientos del Senado de Puerto Rico como parte del proceso de evaluación encaminado a su confirmación como juez municipal.[19]

Para las fechas en que dichos documentos fueron juramentados, el 17 de mayo de 1996 y el 3 de febrero de 2000 respectivamente, no sólo la querellada conocía de los pleitos en los que figuró como demandada sino que ––más aún–– había sido notificada de las sentencias emitidas, las cuales habían adquirido carácter firme. A pesar de ello, al preguntársele,

---

[19] Esta es parte de las formalidades inherentes al proceso de confirmación de nuevos jueces, quienes ––como es conocido–– son nombrados por el Gobernador con el consejo y consentimiento del Senado. La documentación que a estos fines se somete sirve un propósito específico: acreditar la reputación moral, intelectual y profesional de los candidatos nominados. Valga decir que el informe de recomendación emitido por la Comisión de Nombramientos del Senado con respecto a la querellada fue negativo.

en ambos documentos, si figuraba o había figurado como parte en algún pleito civil o ante alguna agencia administrativa, no suplió la información completa.   En uno de los formularios proveyó la información sobre  la demanda de la Sra. Ramírez; en el otro, consignó los datos del pleito más remoto, en el cual figuraron ella y su esposo como parte demandada.

Debido a la diversidad de ocasiones en las que, penosamente, hemos tenido que abordar escenarios de conducta reñida con el Canon 35 de Ética Profesional, nuestro acervo jurídico se ha nutrido de vastas expresiones que trazan los contornos de lo que constituye el deber de sinceridad y honradez de un abogado.

Como principio medular, hemos establecido que "[m]ás que un ideal irrealizable, la verdad es atributo inseparable del ser abogado y, sin la misma, no podría la profesión jurídica justificar su existencia." Esta idea se instrumenta a través del claro mandato que consagra el Canon 35 de Ética Profesional, el cual le impone a todo abogado el ineludible deber de ajustarse a la fidelidad de los hechos tanto en su gestión profesional como en sus gestiones personales. (Énfasis suplido). In re Martínez y Odell, res. el 25 de junio de 1999, 99 T.S.P.R. 119.[20]

Al suplir la información parcialmente, la querellada faltó a la verdad. Ciertamente, el contexto dentro del cual se

---

[20] Si bien es cierto que hemos reconocido que existe cierta conducta personal de un abogado que puede estar fuera del alcance del Canon 35, véase In re: Silvagnoli Collazo, res. el 29 de junio de 2001, 2001 TSPR 196, también es cierto que hemos señalado que el deber de sinceridad y honradez que le impone el referido Canon cobija aquellas actuaciones de un abogado en

manifiesta dicha conducta <u>hace que ésta sea más repudiable</u>. El rigor que distingue la evaluación de un candidato que ha sido nombrado para ocupar una posición de tal jerarquía exige de éste el cumplimiento estricto con todas las exigencias de dicho proceso de manera que la recomendación que se emita, sea negativa o positiva, surja como producto de un análisis informado y bien ponderado. Esto así por razones evidentes: el propósito de tal escrutinio es la consecución de aquél candidato cuyas cualidades le hacen merecedor de ocupar el escaño de juez. Huelga decir que actos como los de la querellada entorpecen este proceso y frustran su razón de ser.

Así, poco importa si de un examen de los documentos en conjunto surge la información completa; <u>un documento no está para complementar al otro</u>. Si así fuera, no estarían estructurados con preguntas de casi idéntica naturaleza pues ello resultaría en un acopio acumulativo de información. Como es de notarse, <u>éstos documentos se someten a oficinas distintas para que cada una de éstas haga lo propio</u>. Por ende, en los mismos no pueden consignarse verdades a medias porque, como es conocido, la verdad a medias no es verdad.

Tampoco influye, en la tarea de determinar si la querellada incurrió en una violación ética, el ánimo, si alguno, que tuvo la querellada para proveer parcialmente una información ––de indiscutible importancia–– pues a estos fines hemos establecido que el deber de ajustarse a la fidelidad de los hechos "se infringe [...] con el <u>hecho objetivo</u> de faltar a la verdad en

_____

las que, actuando como ciudadano común, pretende realizar actos

funciones propias de un abogado o cuando, actuando como ciudadano común, se pretende realizar actos o negocios de trascendencia jurídica." In re Martínez y Odell, ante.[21]

También hemos consignado, en estricta correspondencia con lo expuesto, que este deber se lesiona aún cuando la falta a la verdad no haya ocurrido intencionalmente o con el deliberado objetivo de engañar. In re Rivera Arvelo y Ortiz Velázquez, 132 D.P.R. 840 (1993). En vista de ello, no vacilamos en reafirmar que el deber de ajustarse siempre a la realidad de los hechos es uno que tiene que ser cumplido estrictamente aunque el así hacerlo conlleve sacrificios personales. _

Sometido los hechos cometidos por la abogada querellada al crisol de la normativa antes reseñada, concluimos que el proceder de la querellada constituyó una violación a las normas mínimas de conducta que preceptúan el Canon 35 y el Canon 38 de Ética Profesional.

V

En virtud de lo antes expuesto y tomando en consideración el previo historial, sin quejas, de los aquí querellados, procede que dictemos Sentencia suspendiendo al Lic. Edwin Sepúlveda del ejercicio de la profesión por un término de dos (2) meses. En cuanto a la Lic. Irma Casiano, se justifica su

---

o negocios de trascendencia jurídica.

[21] En In re Belk Arce, res. el 28 de junio de 1999, 99 T.S.P.R. 121, resolvimos que ni siquiera el temor fundado que pueda tener el abogado con respecto a las consecuencias de revelar determinada información justifica que éste falte a su deber de ajustarse a la sinceridad de los hechos. Dicho de otra manera, el temor, por más genuino que sea, no es eximente de

suspensión por un término de tres (3) meses. La suspensión que en esta Opinión *Per Curiam* se decreta <u>comenzará a discurrir a partir de la fecha en que la misma sea notificada a los abogados querellados</u>, a quienes apercibimos de que, en lo sucesivo, deberán regir sus actos de conformidad con las normas consagradas en los Cánones de Ética Profesional.

---

<u>responsabilidad cuando ––obrando en función del mismo–– se infringe ese deber ético</u>.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In Re:

Edwin H. Sepúlveda Valentín          CP-1999-13
Irma E. Casiano Santiago


SENTENCIA

San Juan, Puerto Rico, a 27 de septiembre de 2001

Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia suspendiendo al Lic. Edwin Sepúlveda del ejercicio de la profesión por un término de dos (2) meses. En cuanto a la Lic. Irma Casiano, su suspensión será por un término de tres (3) meses.

Las suspensiones que en esta Opinión *Per Curiam* se decretan comenzarán a discurrir a partir de la fecha en que la misma sea notificada a los abogados querellados, a quienes apercibimos de que, en lo sucesivo, deberán regir sus actos de conformidad con las normas consagradas en los Cánones de Ética Profesional.

Le imponemos al Lcdo. Sepúlveda Valentín y a la Lcda. Casiano Santiago el deber de notificar a todos sus clientes de su presente inhabilidad para seguir representándolos, les devuelvan cualquiera honorarios recibidos por trabajos no realizados, e informen oportunamente de su suspensión a los foros judiciales y administrativos del País. Deberán, además, certificarnos dentro del término de treinta (30) días a partir de su notificación el cumplimiento con estos deberes, notificando también al Procurador General.

La Oficina del Alguacil de este Tribunal procederá, de inmediato, a incautarse de la obra y sello notarial de la Lcda. Irma E. Casiano Santiago, luego de lo cual entregará la misma a la Oficina de Inspección de Notarías para el correspondiente examen e Informe a este Tribunal.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Naveira de Rodón concurre con la Opinión Per Curiam, pero disiente en cuanto a la sanción, pues entiende que la conducta de estos letrados amerita una sanción mayor de suspensión de por lo menos un año a año y medio. El Juez Asociado señor Fuster Berlingeri no intervino. El Juez Asociado señor Rivera Pérez no interviene.

**Isabel Llompart Zeno**
**Secretaria del Tribunal Supremo**